1

ALBERT J. BORO, JR. (CA Bar #126657)
*ajboro@boro-law.com*

2

BORO LAW FIRM
345 Franklin Street

3

San Francisco, CA 94102
Telephone: (415) 621-2400

4

Facsimile: (415) 276-5870

5

6

Attorneys for Defendant
GABRIEL GELACIO TORRES JR.

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO DIVISION

11

UNITED STATES OF AMERICA,

No. 18-CR-00514-SI

12

Plaintiff,

DEFENDANT GABRIEL TORRES JR.'S
SENTENCING MEMORANDUM,

13

v.

OBJECTIONS TO PSR, AND MOTION
FOR DOWNWARD ADJUSTMENT AND

14

DOWNWARD VARIANCE IN
SENTENCING

15

GABRIEL GELACIO TORRES JR.,

16

Defendant.

Date:   October 3, 2019
Time:  11:00 a.m.

17

Court:  Hon. Susan Illston

18

19

20

21

22

23

24

25

26

27

28

# TABLE CONTENTS

TABLE OF CONTENTS ......................................................................... i

I.  INTRODUCTION ..................................................................... 1

II.  STATEMENT OF FACTS ........................................................ 1

III.  SENTENCING GUIDELINES CALCULATION ....................... 2

III.  OBJECTIONS TO PSR AND MOTION FOR
     DOWNWARD ADJUSTMENT ................................................ 3

     A.  Corrections to PSR (PSR ¶¶ 70 & 87) ................................. 3

     B.  Safety Valve (PSR ¶ 45) ........................................................ 4

     C.  Role in the Offense for Count 2 (PSR ¶ 47) ........................... 7

V.  THE MOTION FOR DOWNWARD VARIANCE SHOULD BE
    GRANTED, AND MR. TORRES SHOULD BE SENTENCED TO
    TIME SERVED PLUS 18 MONTHS' COMMUNITY CONFINEMENT
    IN A HALFWAY HOUSE .......................................................... 10

VI.  THE COURT SHOULD ALLOW MR. TORRES TO REMAIN ON
     PRETRIAL RELEASE AND TO SELF-SURRENDER............................. 14

VII.  CONCLUSION ......................................................................... 15

ATTACHMENTS:

EXHIBIT A

## I.      INTRODUCTION

Defendant Gabriel Torres Jr. respectfully submits this Sentencing Memorandum, Objections to PSR, and Motion for Downward Adjustment and Downward Variance in Sentencing for his upcoming sentencing.  Mr. Torres realizes he made serious mistakes, violated the law, and accepts responsibility for his actions.  He is a person with zero criminal history points and has not served a custodial sentence before, and he has strived during his pretrial release to rehabilitate himself, succeeding in maintaining employment and taking classes towards his GED.

A below-Guidelines sentence is warranted here, and we believe Mr. Torres should be sentenced to a term of 18 months in community confinement in a halfway house instead of prison. The Presentence Investigation Report recommends a below-Guidelines sentence of 60 months due to the five-year mandatory minimum sentence in Count 2 and its mistaken view that the safety valve is inapplicable.  Presentence Investigation Report ("PSR") Sentencing Recommendation, filed September 23, 2019, at ECF pp. 24-25 (Dkt. #30).  As explained in the Objections to the PSR, the safety valve applies to this case because Mr. Torres did not possess a firearm in connection with the offense charged in Count 2.  *See infra* Section IV. B.  Considering all of the sentencing factors, a sentence of community confinement in a halfway house is the appropriate sentence in this case.

## II.     STATEMENT OF FACTS

Mr. Torres was charged in a two-Count Indictment with dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) (Count 1), and distribution and possession with intent to distribute 50 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B)(viii).  Indictment, filed Oct. 18, 2018 (Dkt. #9).  On February 20, 2019, the Court held a change of plea hearing (Dkt. #21), and Mr. Torres pled guilty to Counts 1 and 2 of the Indictment.

The PSR shows that Mr. Torres's conduct that led to the criminal charges was his selling of firearms to one individual, who turned out to be a Government confidential informant ("Individual 1").  PSR at ¶ 6.  Count 1 of the Indictment charges that Mr. Torres sold these firearms without having a license to sell them.  Indictment (Dkt. #9); PSR at ¶ 6.  The firearm sales occurred on multiple occasions from November 2016 to June 2018, and involved more than 25 firearms.  PSR at

¶¶ 7-23.

Mr. Torres's conduct also included the sale of methamphetamine to Individual 1. PSR at ¶¶ 25 to 30. This conduct is charged in Count 2 of the Indictment. Indictment (Dkt. #9). As stated in the PSR, Mr. Torres did not own the drugs sold to Individual 1, but instead he obtained the methamphetamine from another individual ("Individual 2") and collected money from Individual 1 that he delivered to Individual 2, who paid Mr. Torres a fee for his efforts. PSR at ¶ 24. The firearms transactions and drug transactions involved the same buyer, confidential informant Individual 1, but were separate transactions. The PSR states: "Mr. Torres Jr. did not possess both the firearms and methamphetamine to sell in conjunction to Individual 1." *Id*. at ¶ 31.

## III.   SENTENCING GUIDELINES CALCULATION

Mr. Torres objected to the Sentencing Guidelines calculation in the PSR, which is a Total Offense Level of 26. PSR at ¶ 57. The parties agree that Mr. Torres has zero criminal history points and is a Criminal History Category I. Id. at ¶ 64. The PSR's Guidelines calculation is a sentence of 63 to 78 months. PSR Sentencing Recommendation at ECF p. 24. Mr. Torres contends that the correct calculation of his Total Offense Level under the Guidelines is actually 21 or 23, depending on the Court's determination of his role in Count 2 for distribution of methamphetamine. This corrected calculation results in a Guidelines sentence of 37 to 46 months or 46 to 57 months.

Mr. Torres does not object to the Guidelines calculation for Count 1, but, as explained in Section IV, *infra*, he objects to Guidelines calculation for Count 2 due to the PSR's failure to include an adjustment for his role in the offense and a downward adjustment for the safety valve, and he objects to the grouping calculation. Mr. Torres arrives at a Total Offense Level of 21 or 23 based on the following calculations of the offense levels for Counts 1 and 2 and the grouped combined offense level:

**Count 1 – Dealing in Firearms without a License**:

a. Base Offense Level, USSG § 2K2.1(7)                                        **12**

b. Specific Offense Characteristics:

(i)  More than 25 firearms, USSG § 2K2.1(b)(1)(C)                  **+6**

(ii) Engaging in the trafficking of firearms, USSG § 2K2.1(b)(5)   **+4**

c.   Adjusted Offense Level for Count 1                                    **22**

**Count 2 – Distribution of 50 Grams or More of Mixture of Methamphetamine:**

a.   Base Offense Level, USSG § 2D1.1(5) & (c)(6)                          **28**

b.   Specific Offense Characteristics:

   (i)  Safety Valve, USSG § 2D1.1(b)(18)                             **-2**

c.   Adjustment for Role in the Offense, either minimal or minor          **<u>-4 or -2</u>**

d.   Adjusted Offense Level for Count 2                                    **22 or 24**

**Grouping of Counts 1 and 2:**

Add 2.0 Units because the two groups are within 1 to 4 levels of each

and add 2 levels to group with highest offense level, USSG § 3D1.4        **24 or 26**

**Adjustment for Acceptance of Responsibility:**

3 levels due to his early acceptance of responsibility                    **-3**

**Total Offense Level:**                                                  **21 or 23**

Mr. Torres requests that the Court determine that his Total Offense Level is either 21 or 23, depending on whether the Court determines that his role in the drug distribution offense charged in Count 2 was a minimal role or a minor role.

## IV.   OBJECTIONS TO PSR AND MOTION FOR DOWNWARD ADJUSTMENT

Mr. Torres objected to the PSR for its failure to include downward adjustments in the offense level for Count 2 to account for the safety valve and his lesser role in the drug distribution offense. PSR Addendum at ECF p. 22.  In reviewing the final version of the PSR, Mr. Torres also noticed a few corrections that should be made to two paragraphs in the PSR.

### A.   Corrections to PSR (PSR ¶¶ 70 & 87)

Mr. Torres requests that the following corrections be made to text of the PSR:

1.   Paragraph 70

This paragraph describes Mr. Torres's family.  First, in lines 5 to 6, Gabriel Torres (age 21) is listed as a "full sibling," but he is actually a paternal half-sibling, and his name should be moved to the next sentence that discusses Mr. Torres's paternal half-siblings.  Second, one of Mr. Torres's paternal half-siblings – his youngest sister – has been left out of the PSR and should be added to the

last sentence of the paragraph concerning paternal half-siblings: "G.T. (age 17, residing in Tijuana, Mexico)."

### 2. Paragraph 87

In the first line discussing Mr. Torres's current employment, change "a cashier earning $14 per hour" to "a kitchen assistant earning $16 per hour."

## B. Safety Valve (PSR ¶ 45)

Mr. Torres objected to the PSR because it did not find the safety valve applicable to him for his conviction on Count 2 for distribution of methamphetamine. 18 U.S.C. § 3553(f)(2); USSG § 5C1.2(a)(2). As Mr. Torres pointed out in his objections, the PSR fails to include a 2-level downward adjustment for the safety valve in the Guidelines calculation for Count 2. PSR at ¶ 45 (listing as "0" the adjustment for Specific Offense Characteristics); *see* USSG § 2D1.1(b)(18) (providing for a 2-level downward adjustment). He also objected that the PSR's statutory penalty discussion failed to recognize that the mandatory minimum sentence of 5 years under 21 U.S.C. §§ 841(a)(1) & (b)(1)(B)(viii), is inapplicable because the safety valve provides that "the court shall impose a sentence pursuant to guidelines . . . without regard to any statutory minimum sentence, if the court finds at sentencing" that the safety valve has been met. 18 U.S.C. § 3553(f); *see* PSR at ¶ 90.

Only one of the five safety-valve factors is in dispute. As set out in the Addendum to the PSR, the only dispute is on the second criteria: whether Mr. Torres "possess[ed] a firearm . . . in connection with the offense." PSR Addendum at ECF p. 22-23; *see* 18 U.S.C. § 3553(f)(2); USSG § 5C1.2(a)(2). The reasoning in the PSR is that the firearm sales charged in Count 1 and the drug sales in Count 2 are "connected" because "[b]oth offenses were listed in the same charging document and [Mr. Torres's] drugs and firearms transactions involved the same unindicted person." PSR Addendum at ECF p. 22. The PSR Addendum further states that Mr. Torres "possessed the firearms prior to the illegal sales and on several occasions sold the firearms to Individual 1 *prior to selling* various amounts of methamphetamine to Individual 1." *See id.* at ECF p. 23 (emphasis added).

This so-called "connection" relied on in the PSR Addendum does not support a finding that Mr. Torres "possess[ed] a firearm . . . in connection with the [drug] offense" within the meaning of

the statute and the Guidelines.  *See* 18 U.S.C. § 3553(f)(2); USSG § 5C1.2(a)(2).  The PSR admits that the gun sales and drug sales were separate transactions and not conducted as a single transaction. *See* PSR Addendum at ECF p. 23.  The PSR also states that "[a]ccording to discovery evidence and analysis from the Government; Mr. Torres Jr. did not possess both the firearms and methamphetamine to sell in conjunction to Individual 1."  PSR at ¶ 31.  This finding alone should foreclose an argument that the firearms were possessed in connection with the drug offense.  The PSR makes clear that the firearms sales and the drug sales were separate offenses, separated in time, and not possessed to sell "in conjunction" with each other, even if they were sold to the same confidential informant Individual 1.

The Ninth Circuit has recognized that "to qualify for relief the defendant must only prove by a 'preponderance of the evidence' that a weapon was not used in connection with the offense." *United States v. Nelson*, 222 F.3d 545, 550 (9th Cir. 2000).  There, the Court recognized that even if the defendant received a 2-level enhancement under USSG § 2D1.1(b)(1) because he or she "possessed" a firearm, the defendant could still qualify for the 2-level downward adjustment under the safety valve, USSG  §§ 2D1.1(b)(18) & 5C1.2(a)(2), because he or she did not "possess" it "in connection with the offense."  Nelson, 222 F.3d at 551 ("For purposes of § 5C1.2, therefore, we hold that, even where a defendant has already received a § 2D1.1 enhancement, the defendant need only show his eligibility for relief by a preponderance of the evidence.").  The present case is clearer than *Nelson* because the Government and Probation concede that the 2-level enhancement under § 2D1.1(b)(1) for possession of firearms does not apply to Count 2 because the two different types of contraband were not sold in "conjunction."  PSR at ¶ 31.  It follows that the firearms were not possessed "in connection" with the drug sales in Count 2 but rather were goods separately offered for sale.

Second, the "offense" in § 5C1.2(a)(2) that the firearms must be possessed in connection with is Count 2, distribution of methamphetamine, and not the conduct of unlicensed sale of firearms charged in Count 1.  The commentary to the section states that "offense" in § 5C1.2(a)(2) "means the offense of conviction and all relevant conduct."  USSG § 5C1.2 app. n.3.  "Relevant conduct" is defined in § 1B1.3 as "all acts and omissions" committed or aided and abetted or willfully caused by

the defendant, but that broad definition is limited in its applicability where there are multiple counts by the rules on grouping of counts in §§ 3D1.1 and 3D1.2, which provide for the grouping of closely related counts (defined as a "Group"). The Guidelines direct: "All counts involving substantially the same harm shall be grouped together into a single Group." USSG § 3D1.2. Of particular note here, "counts involve[ing] the same victim and two or more acts or transactions . . . constituting part of a common scheme or plan" are grouped, if they involve "substantially the same harm." *Id.* § 3D1.2(b). However, where the victim is society at large, "the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed" and counts are not grouped together if different societal interests are harmed." *Id.* § 3D1.2 app. n.2. The Guidelines give as an example a drug sale count and an immigration law violation count as counts that "are not grouped together because different societal interests are harmed." *Id.* The principle underlying the Guideline's grouping rules is that, "[i]n essence, counts that are grouped together *are treated as constituting a single offense for purposes of the guidelines.*" *Id.* Ch. 3, Pt. D Introductory Commentary (emphasis added).

In the present case, Count 1 (firearms dealing) and Count 2 (methamphetamine distribution) are each their own Group, and the conduct charged in each is a "single offense for purposes of the guidelines." USSG Ch. 3, Pt. 4 Introductory Commentary. "Different societal interests" are harmed in Count 1 concerning the conduct of unlicensed firearm sales (the societal interest in reducing illegal firearms on the street and the potential harm posed by them) from those harmed by Count 2 (the societal interest in keeping illegal drugs out of the community and the harm caused by drug abuse). Count 1 and Count 2 do not involve "the same victim" and are separate groups, *id.* § 3D1.2(b) & app. n.2, and each group constitutes "a single offense." *Id.* Ch. 3, Pt. 4 Introductory Commentary. It follows that the "offense" in Count 2, from which the applicability of the safety valve guidelines is determined, *id.* § 5C1.2(a)(2), does not include as relevant conduct the conduct that comprises the separately grouped offense in Count 1 because each set of conduct is its own "offense" for purposes of the Guidelines. The conduct that makes the offense and relevant conduct of Count 2 does not include possession of a firearm; therefore, the second prong of the safety valve is satisfied. *Id.* § 5C1.2(a)(2).

Third, if the Court were to hold that the conduct charged in Count 1 is relevant conduct to

Count 2 and for that reason find the safety valve inapplicable, then it would be improper to apply the grouping rules to increase further the total offense level.  Finding the conduct charged in Count 1 "relevant conduct" to Count 2 means that the two Counts "constitute[e] part of a common scheme or plan" and are part of a single Group.  USSG § 3D1.2(b).  The PSR applies a 1-level increase for grouping, PSR at ¶¶ 50-53, and that enhancement would be eliminated to result in a total offense level of 25, with a Guidelines recommended sentence of 57 to 71 months.  However, as explained above, the PSR's approach violates the Guidelines because Counts 1 and 2 are separate Groups that implicate different societal harms, and each is its own offense for purposes of the Guidelines.

### C.  Role in the Offense for Count 2 (PSR ¶ 47)

Mr. Torres also objected to the PSR for its failure to provide a downward adjustment in the Guidelines calculation for Mr. Torres's lesser role in the offense charged in Count 2 for distribution of methamphetamine.  The PSR provides no reduction for Mr. Torres's role in Count 2 because it views his role as supposedly "pivotal for the success of the drug and firearm transactions," which would not have occurred "[w]ithout his active participation."  *See* PSR at ¶ 47 & PSR Addendum at ECF p.22.  This response conflates Mr. Torres's conduct in Counts 1 and 2 and misapplies the standards for mitigating role.  Correctly applying the Guideline provisions for mitigating role to Count 2 results in a 2- to 4-level downward departure, depending on the Court's determination whether he played a minor or minimal role (or somewhere in between).

Mr. Torres's objection to role in the offense was limited to Count 2, distribution of methamphetamine.  The PSR's use of his role in the firearm transactions to deny him a role adjustment to Count 2, which is limited to drug distribution, is error.  Mr. Torres did not request a role reduction in the Guidelines calculation for Count 1, and limited his objection to Count 2, where his conduct is very different.  The determination of a downward departure for the Guidelines calculation for Count 2 should be limited to a consideration of his conduct in that offense.  *See* USSG § 3B1.2 (focusing on "the defendant's role in the offense"); *cf. supra* Section IV.B.

Mr. Torres conduct charged in Count 2 qualifies him for a minor or minimal role adjustment.  The PSR shows Mr. Torres only acted as a delivery person who received a fee for the delivery of methamphetamine to confidential informant Individual 1, and he did not set the price and quantity

for the drug deals or have the relationship with the source of supply.  *See* PSR at ¶ 24.  The PSR describes Mr. Torres's conduct in Count 2 as obtaining methamphetamine from Individual 2 and delivering it to Individual 1 and collecting the money, which Mr. Torres turned over to Individual 2 and received a fee for his assistance with the transaction.  *See id.*  For example, in the June 28, 2018 sale of methamphetamine, the Criminal Complaint shows that Mr. Torres Jr. did not obtain the drugs for his own account and resell them but instead only acted as an intermediary.  The Criminal Complaint alleges that the drugs were brought to the meeting location by Individual 2 and Mr. Torres walked over to Individual 2's car to obtain them and then handed them over to Individual 1 and collected the money, and shortly after that drove to meet Individual 2 to hand over the money.  *See* Criminal Complaint at ¶¶ 22-26 (Dkt. #1).

Mr. Torres's role in Count 2 as a delivery person for the drugs is a minor or minimal role in the distribution of the drugs at issue in Count 2.  The Criminal Complaint alleges that at least one other person (Individual 2) was involved in the offense, and that Mr. Torres only delivered the drugs for a fee.  Even though Mr. Torres is the only person convicted of Count 2, the mitigating role adjustment applies because the "offense involved other participants in addition to the defendant and the defendant otherwise qualifies for such an adjustment."  USSG § 3B1.2 app. n.2.  The PSR's denial of this adjustment for the drug sales because "none . . . would have taken place" "[w]ithout his active participation" substitutes a "but for" causation standard for the Guidelines' direction to assess the relative culpability of the participants in the offense.  *Compare* PSR Addendum at ECF p. 22, *with* USSG § 3B1.2 app. n.3(A) & n.3(C) ("The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative.").  As the Ninth Circuit has observed, "the touchstone of a § 3B1.2 adjustment is the defendant's relative culpability."  *United States v. Demers*, 13 F.3d 1381, 1384 (9th Cir. 1994).

Here, Mr. Torres's role as a delivery person who did not purchase the drugs for his own account for resale and was only paid a fee for his assistance, warrants at least a 2-level downward departure for minor role (if not 4 levels for minimal role).  A "minor role" adjustment applies to a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."  USSG § 3B1.3 app. n.5.  That Count 2 charges distribution

and not a conspiracy and the Guidelines calculation for Count 2 are based only on the quantity of drugs that Mr. Torres delivered does not mean that he cannot have played a minor or minimal role in the offense.  The Ninth Circuit has held that "for a defendant to be eligible for a minor participant adjustment where he was the sole participant in the offense of conviction, the evidence available to the court at sentencing must, at a minimum, show (i) that the 'relevant conduct' for which the defendant would, within the meaning of section 1B1.3(a)(1), be otherwise accountable involved more than one participant (as defined in section 3B1.1, comment. (n.1)) and (ii) that the defendant's culpability for such conduct was relatively minor compared to that of the other partic[i]pant(s)." *United States v. Webster*, 996 F.2d 209, 212 (9th Cir. 1993) (*per curiam*), *amended* 1993 U.S. App. LEXIS 17229 (July 11, 1993) (remanding for resentencing because defendant convicted of possession with intent to distribute may be eligible for downward adjustment based on alleged role as drug courier); *see Demers*, 13 F.3d at 1382, 1383-84 (9th Cir. 1994) (vacating sentence where district court denied minor-role adjustment for defendant who pled guilty to one count of possession with intent to distribute in exchange for dismissal of conspiracy charge in 19-defendant, 62-count indictment); USSG § 1B1.3 (defining relevant conduct to include all acts or omissions that were part of a common scheme); *id*. § 3B1.2 app. n.3(A) ("For example, a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under this guideline.").

Applying the test in *Webster* and *Demers* to the present case, at least a 2-level downward adjustment should be applied to Count 2 due to Mr. Torres's relative culpability in the offense.  The PSR shows that there was at least one other person involved in the offense charged in Count 2 and that Mr. Torres's conduct was relatively minor because he merely delivered the drugs and collected the money and received only a fee, but he was not the supplier of the drugs nor did he take ownership of them for his own account to re-sell them.  As the Guidelines observe, "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." USSG 3B1.2 app. n.3(C).  That is precisely the case here and a downward adjustment in the Guidelines

1  calculation of at least 2 levels is warranted.

2  **V.      THE MOTION FOR DOWNWARD VARIANCE SHOULD BE GRANTED,**

3  **AND MR. TORRES SHOULD BE SENTENCED TO TIME SERVED PLUS 18 MONTHS'**

4  **COMMUNITY CONFINEMENT IN A HALFWAY HOUSE.**

5         Section 3553(a) directs the Court to " 'impose a sentence sufficient, but not greater than

6  necessary,' to accomplish the goals of sentencing."  18 U.S.C. § 3553(a); *Kimbrough* v. *United*

7  *States*, 552 U.S. 85, 101 (2007).  "The Guidelines are not only *not mandatory* on sentencing courts;

8  they are also not to be *presumed* reasonable." *Nelson* v. *United States*, 555 U.S. 350, 352 (2009)

9  (*per curiam*) (emphasis in original).  Here, Probation recommends a below-Guidelines sentence of

10 60 months, in part to satisfy the 5-year mandatory minimum sentence for Count 2 due to its

11 incorrect view that the safety valve is not available.  PSR Sentencing Recommendation at ECF pp.

12 24-25.  It is our view the safety valve applies to Count 2 and a below-Guidelines sentence should be

13 imposed.  The Court should grant a downward variance to a sentence of time served in jail (when

14 Mr. Torres was arrested prior to his pretrial release) plus 18 months of community confinement in a

15 residential halfway house, followed by a term of supervised release.  The community confinement

16 and supervised release should include conditions of substance abuse counseling, obtaining his GED,

17 and maintaining employment.  *See id*. at ECF pp. 25-26 (listing proposed conditions for supervised

18 release and noting that prior to his arrest, Mr. Torres "was abusing marijuana").  This requested

19 sentence is supported by the nature and circumstances of the offense, considerations of deterrence,

20 protection of the community from further crimes, and the history and characteristics of Mr. Torres.

21 *See* 18 U.S.C. § 3553(a)(1) & (2).

22        Mr. Torres also requests that the Court allow him to transfer to the Southern District of

23 California to serve this sentence in a halfway house in San Diego area.  This will enable him to be

24 close to his daughter, who is 9 years old and resides with her mother in that area.  PSR at ¶¶ 75, 77.

25 This transfer will also allow Mr. Torres to join an apprentice program in the construction trades

26 with the help of his half-brother Ricardo Lopez, who works in the construction industry in the San

27 Diego area.  *See id.* at ¶ 76.  His brother confirmed in an interview with Probation that he would

28 continue to support his brother and help him obtain employment in the construction trades.  *Id.*

The crimes charged here – selling firearms and distributing methamphetamine – are serious crimes, and Mr. Torres recognizes that punishment is required to reflect the seriousness of the offenses and promote respect for the law.  *See* 18 U.S.C. § 3553(a)(1) & (2)(A).  Here, a sentence of community confinement is "sufficient, but not greater than necessary," to accomplish those sentencing goals because Mr. Torres has zero criminal history points and has not previously served a custodial sentence.  For someone like Mr. Torres who has not before been in custody, confinement in a halfway house is sufficient to reinforce the message that criminal activity is punished, while furthering society's interests in promoting his rehabilitation and maintaining employment, so that he does not return to a criminal livelihood.  The PSR recognizes that Mr. Torres's history and characteristics, including his disrupted family life and fathering a child at age 14, his marijuana abuse, his youthfulness at the time of these offenses, and his post-offense rehabilitation could support a downward variance.  PSR at ¶ 109.  A prison sentence would be "greater than necessary" under the totality of circumstance of this case to accomplish the purposes of sentencing.

Mr. Torres Jr.'s personal history and characteristics support a downward variance under 18 U.S.C. § 3553(a).  Mr. Torres was born in Palo Alto, California, but when he was an infant, his father was deported and he took Mr. Torres to Mexico.  PSR at ¶ 70.  His father and mother were never married, and he never knew his mom.  *Id*.  Mr. Torres spent his youth in Mexico and was raised by his grandparents and worked on the family farm.  *Id*. at ¶ 71.  He received only minimal education and did not have the same educational opportunities as a youth similar in age growing up in the United States.  *Id*. at ¶¶ 71 & 76.  Upon returning to the United States at about age 12, he enrolled in school, but did not speak English and was disadvantaged in his studies.  *Id*. at ¶ 76.  He fathered a child at about age 14, which further hindered his obtaining an education and maturing into a responsible adult.  *Id*. at ¶ 73.  He did not complete high school.  *Id*.  He had moved in with his girlfriend's family but returned to Mexico to be with his father when his father was again deported.  *Id*.  At age 17, Mr. Torres returned to the San Diego area to be near his daughter and former girlfriend but they were unable to reconcile, and at the age of 18 he obtained housing with his aunt in San Mateo.  *Id*. at ¶¶ 73-74.

By age 18, Mr. Torres had fathered a child and dropped out of high school, and had been shuttled between several different parental figures, residences, and countries.  At about the same time, he developed an addiction to marijuana.  PSR at ¶¶ 80 & 109.  Arriving in San Mateo with all of these difficult life experiences at such a young age, his aunt may not have been in a position to provide the guidance and discipline he needed to avoid associating with other young men who displayed the trappings of success but were involved in criminal activity.  *See id.* at ¶¶ 74 & 76.

Notwithstanding his immature and wrong decisionmaking that led him to commit the crimes in this case, Mr. Torres is a decent person with a bright future to contribute to his daughter's life and society.  His character traits of optimism, hard work, and decency come through in the summary of Probation's interview of his brother Ricardo.  PSR at ¶ 76.  They are also demonstrated in the letter of support from his youngest sister, G.T., age 17.  *See infra* Ex. A.  She writes of Mr. Torres's "positive vibes" and his ability to make her feel at ease when she discusses with him her concerns, as well as his character traits of hard work and respectfulness towards his family.  *Id*.  Mr. Torres's history and characteristics support that a sentence of community confinement is sufficient, but not greater than necessary, to promote respect for the law while furthering society's interests in rehabilitation and prevention of crimes.

Mr. Torres Jr.'s youth at the time of these crimes also supports a downward variance under 18 U.S.C. § 3553(a).  He is 25 years old now, and at the time of the events in this case, he was only 22 to 23 years old.  His brother Ricardo reported to Probation that Mr. Torres was a " 'late bloomer,' " grew up on a farm in Mexico milking cows and did not begin learning English until returning to the United States at age 12 and consequently struggled in school and "sometimes took longer to process conversations."  PSR at ¶ 76.  The upheaval Mr. Torres experienced in the first 18 years of his life is an important consideration in sentencing him for the crimes he committed while still an immature young adult.

The Supreme Court has recognized that " '[i]mmaturity at the time of the offense conduct is not an inconsequential consideration.  Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. . . . While age does not excuse behavior, a sentencing court should account for age when inquiring into

the conduct of a defendant.' " *Gall v. United States*, 552 U.S. 38, 58 (2007). Also, " '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' " *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993)). Here, Mr. Torres's conduct speaks to the impetuousness and recklessness of youth, but the immaturity that led to this criminal conduct can be grown out of. His criminal history of zero criminal history points supports that he does not pose a risk to society, and imprisonment is not necessary to protect the community.

Mr. Torres's post-offense rehabilitation also supports a downward variance under 18 U.S.C. § 3553(a). Prior to his arrest, Mr. Torres relocated to San Diego to be close to his daughter and leave the criminal milieu he had found himself part of in the Bay Area. While in San Diego, he got a job with the help of his brother Ricardo in the construction industry. His brother reported in his interview with Probation that Mr. Torres worked alongside him at a construction site in the San Diego area, and "he kept a watchful eye over his brother and made sure he went to work and stayed out of trouble." PSR at ¶ 76. Mr. Torres actions prior to his arrest of removing himself from the environment in which he succumbed to the temptations of quick money from selling contraband and to undertake gainful employment in construction show that a prison sentence is not needed to deter Mr. Torres or to protect the community from future criminal activity by him.

Following his arrest in this case, Mr. Torres has continued to demonstrate his post-offense rehabilitation. He has maintained full-time employment and is working towards obtaining a GED. PSR at ¶¶ 81-84. These constructive steps further his rehabilitation and make it less likely that he would return to committing crimes to make money. His half-brother Ricardo is employed in the construction trades in the San Diego area, and he will assist Mr. Torres in entering a union trade apprenticeship program in San Diego. *Id.* at ¶ 76. This will enable Mr. Torres to maintain gainful employment and to be close to his daughter who lives in the San Diego area. His post-offense rehabilitation shows that he is maturing and becoming a responsible member of society, and a prison sentence is not needed for purposes of deterrence or to protect the public from further criminal activity.

The letter of support of Mr. Torres's manager at his current job as a kitchen assistant attests to his work ethic and post-offense rehabilitation. *See infra* Ex. A. His manager, who has 21 years' experience in the restaurant industry, states he "could not be more proud to call Gabriel a co-worker" and he is "a great employee with a solid work ethic." *Id.* His manager states that Mr. Torres has proven from his job performance that he is a person who if you put the time "to invest in him, it will not be squandered," and he tells the Court "granting him a second chance will be seen by him as an opportunity to do better and valued as such." *Id.* Given Mr. Torres's zero criminal history points and his post-offense rehabilitation, an investment of a second chance for him will not be a wasted effort by the Court.

In sum, the Section 3553(a) sentencing factors, in light of the totality of circumstances of this case, support the conclusion that a sentence of time served and community confinement is the appropriate sentence in this case.

## VI.    THE COURT SHOULD ALLOW MR. TORRES TO REMAIN ON PRETRIAL RELEASE AND TO SELF-SURRENDER.

Because Mr. Torres has been on pretrial release with no violations and has maintained gainful employment the entire time, the Court should order his continued release pending execution of sentence and to permit him to self-surrender. 18 U.S.C. § 3143(a)(2). The PSR recognizes that Mr. Torres "has kept all court appearances and has complied with conditions of pretrial release." PSR Sentencing Recommendation at ECF p. 25. Just as exceptional circumstances supported Mr. Torres remaining on pretrial release pending sentencing, they also support his remaining on pretrial release while awaiting execution of sentence.

Section 3145(c) permits a Court to release a defendant pending execution of sentence if (i) there are exceptional reasons and (ii) the release conditions set forth in Section 3143(a)(1) are met. *See* 18 U.S.C. § 3145(c). That section provides in relevant part:

> "A person subject to detention pursuant to section 3143(a)(2) or (b)(2) [18 USCS § 3143(a)(2) or (b)(2)], and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1) [18 USCS § 3143(a)(1) or (b)(1)], may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate."

The conditions of release set forth in section 3143(a)(1) are that "the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(a)(1).  Here, there is no dispute that Mr. Torres is not likely to flee or pose a danger to the community.  *See* PSR Sentencing Recommendation at ECF p. 25.  During his time on pretrial release, Mr. Torres has demonstrated his ability to be a law-abiding citizen, has remained gainfully employed, and has taken classes towards a GED.  The exceptional circumstances previously found by the Court still exist, so the Court should permit Mr. Torres to remain on pretrial release pending execution of sentence.

## VII.    CONCLUSION

For the foregoing reasons, Mr. Torres respectfully requests that the Court takes the following actions at his sentencing hearing:

1.    Grant Mr. Torres's objections to the identified paragraphs of the PSR and direct Probation to make the corrections requested herein.

2.    Grant Mr. Torres's motion for a downward adjustment in the Guidelines calculation for Count 2 to account for the safety valve and a role adjustment of a minor or minimal role in the offense, and find that the safety valve applies to Count 2.

3.    Grant Mr. Torres's motion for a downward variance from the Guidelines to a sentence of time served plus 18 months' community confinement in a halfway house, and transfer him to the Southern District of California to serve time in a halfway house in that District.

4.    If the Court were to impose a prison sentence, recommend to the Bureau of Prisons that Mr. Torres be housed as close to the San Diego area as feasible so that he is close to his daughter and brother.

5.    Impose a term of supervised release of 3 years on Count 1 and 4 years on Count 2, with the terms to run concurrently, and provide that Mr. Torres may transfer to the Southern District of California to serve his term of supervised release there, so that he is close to his daughter and may work with his brother in the construction industry, and include conditions that he maintain employment, obtain a GED, and participate in substance abuse counseling.

6.    No fine be imposed due to Mr. Torres's limited financial resources.

7.   Grant Mr. Torres's request to remain on pretrial release pending execution of his sentence due to exceptional circumstances.

Dated: September 30, 2019                    Respectively Submitted:

                                            BORO LAW FIRM


                                            /s/ Albert J. Boro, Jr.
                                            ALBERT J. BORO, JR.

                                            Attorneys for Defendant
                                            GABRIEL GELACIO TORRES JR.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

March 19, 2019

To whom It may concern,

I G███████████ the youngest sister of Gabriel Torres would like to add that my brother is of course a very carefree and respectful person. He can make a bad situation into a good one just by spreading around his positive vibes. He's very hardworking and I admire that because due to that he works hard and earns what he wants. Whenever I need advice I always turn to him and he always knows what to say to make me feel at ease. Not to sound biased but he really goes out of his way to try and be the best person he can be around all of us that are his family members. He's helpful and helps us when it comes to chores or anything we basically need help with. My brother in general is just someone very dear to me and I love him. He's someone really great.

Honorable Susan Illston
United States Senior District Judge
Northern District of California
450 Golden Gate Avenue, 17th Floor
San Francisco, CA 94102

Dear Judge Illston,

 My name is Devin Aloise; I'm a 21 year veteran of the restaurant industry. I've been an owner
(not recommended), General manager, multi-unit manager, server, busboy and like many a
dishwasher. Suffice it to say; I take what I do for a living; the stewardship of small business, the
work environment and staff inside of it, very seriously. I'm writing this letter today for the sole
purpose of shining a light on Gabriel Torres.

I joined the team as GM at Redwood shores (RWS) at the end of august 2019, this location had
its problems, amongst them was a complete lack of leadership. When I first met Gabriel, he was
active in our kitchen and like much of the staff at the time stressed to the max and feeling under-
appreciated and overworked. As you can imagine that environment had worn on him; it didn't
take an expert to notice lack of motivation or pride in the workplace, similar to that of an
unwatered plant wilting in the hot sun. This sentiment was the downward spiral of the
workplace; it was the root cause of the majority of issues and my biggest concern.

What struck me about Gabriel was on the first day he introduced himself to me while much of
the staff remained somewhat bashful. He and I developed a report almost immediately, he
proved to me over that first week that he is not "some kid" but instead an adult willing to take on
responsibility with a desire to learn more. In those early days RWS needed a lot of attention,
and as management worked to install the organizing tools and cleaning programs, Gabriel
stepped up and assimilated these changes with no push back. He worked harder, came in
earlier, and stayed longer to help push the ideals of workplace betterment. Most notable Gabriel
was always first in line to take on the particular cleaning projects that others wouldn't. This guy
has grit and drive and wants to be apart of something good; he has shown me nothing but
respect and a desire to do better with what he has. His work place outlook has made him an
essential part of our team here. Furthermore, in the five weeks I've been here, I have watched
him go from an unassuming younger guy on our staff to earning my respect and more
importantly the respect of his co-workers.

Gabriel has become a trusted linchpin of our production line. On our busiest days he right there
pushing through; getting the work done. On our slowest afternoons, he is the first to ask "what
else can I do." He is the grease that keeps our location running, and the inspiration behind why I
continue to do what I do for a living. Frankly speaking, I could not be more proud to call Gabriel
a co-worker and would gladly put him forward as an example of a great employee with a solid
work ethic. In my twenty plus years of doing this; looking over all the experiences with all the
staff members; I can tell you the exactly what is the most important aspect of Gabriel's
performance to me personally. Mr. Torres has proven that if I take the time to invest in him, it will
not be squandered. He has shown me first hand that the value of that investment is understood,
and that he will use the opportunity to drive himself and make good on it. As I'm sure you know
from experience, this is a quality that is not taught; it is rare to find someone that sees your
effort, even tougher is finding the person who places as much value on those efforts as you do.
It is hard to find someone that takes what you give them and does more with it. Mr. Torres

embodies these qualities, and if you allow me to say so; granting him a second chance will be seen by him as an opportunity to do better and valued as such.

Thank you for your time; if you have any questions, please do not hesitate to reach out.

sincerely,

Devin Aloise
DAloise@specialtys.com